IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 02-0730
════════════
 
Excess Underwriters at 
Lloyd’s, London 
and Certain Companies Subscribing Severally But Not Jointly to Policy No. 
548/TA4011F01, Petitioners,
 
v.
 
Frank’s Casing Crew & 
Rental Tools, Inc., Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
Argued February 
15, 2006
 
 
            
Justice Hecht, joined by 
Justice Green, dissenting.
 
            
By refusing to apply to insurers the same law of unjust enrichment that 
applies to everyone else, the Court hands Frank’s Casing Crew & Rental 
Tools, Inc. $7 million for which it paid nothing and to which it has no 
contractual right. The court does not deny the injustice of this result but 
argues that such windfalls are necessary to avoid situations in which an insured 
might be prejudiced by having to pay its own liabilities. Never mind that 
Frank’s Casing claims no such prejudice in this case, or that no case can be 
found in which any insured ever claimed such prejudice, or that if any imagined 
prejudice ever actually did occur, it could easily be remedied. The Court’s 
holding is contrary to the only other cases it can find on the subject,[1] and it has been expressly rejected in the 
Restatement (Third) of Restitution and Unjust Enrichment.[2] Worst of all, the burden of the windfalls 
in this and many other cases will most likely fall on other policyholders who 
have never tried to get away with demanding more coverage than they bought, so 
that insureds who stick to their policies will have 
the privilege of paying extra to satisfy the claims of those who do not.
            
A blanket rule providing an insurer reimbursement for payment of 
non-covered claims might work unfairness. An insurer could try to take unfair 
advantage of its insured’s inexperience in assessing coverage issues and use a 
weak coverage dispute, coupled with the threat of a reimbursement claim if 
coverage is found lacking, to force the insured to contribute more toward the 
settlement of a liability claim than it should, thereby denying the insured the 
full protection of insurance to which it was entitled. But the Court’s rule 
denying reimbursement in every situation is more than potentially unfair. 
As this case demonstrates, it actually allows an insured to take unfair 
advantage of the extra-contractual liability an insurer faces for failing to 
resolve claims against the insured and leverage the threat of that liability to 
force its insurer to settle a claim and abandon a serious coverage issue, 
thereby effectively obtaining coverage it did not pay for and increasing the 
risk for which other policyholders must pay. The general law of restitution 
avoids the problems of both extremes by allowing reimbursement to prevent unjust 
enrichment but not otherwise.[3] This is reflected in section 35 of the 
Restatement (Third) of Restitution and Unjust Enrichment, recently 
adopted by the American Law Institute.[4] Section 35 provides a balanced, 
practical, and principled rule for resolving the issue presented by this 
case.
            
The Court encourages insurers, as it has in the past, to obtain prompt 
resolution of coverage disputes, but today’s decision leaves them no 
alternative. Now an insurer must litigate coverage before a liability 
claim is resolved, even if that means putting an insured in the undesirable 
position 
class=Section2> 
of having to 
fight liability and coverage at the same time, even if it means litigating the 
liability claim in a declaratory judgment action to determine coverage, and even 
if it means delaying resolution of the liability claim until coverage has been 
determined. Otherwise, an insurer will be denied the right to litigate coverage 
altogether, which the Court surely cannot intend. I suspect that this 
consequence of the today’s decision, forcing more coverage litigation, will 
cause far more problems than the hypothetical concerns expressed in the Court’s 
opinion.
            
For these reasons, which I now explain more fully, I respectfully 
dissent.
I
            
Respondent Frank’s Casing Crew & Rental Tools, Inc. has provided oil 
well and completion services and products throughout the United States 
since 1938. Headquartered in Louisiana, it has 
offices in Texas and transacts business here.
            
In 1995, an offshore drilling platform that Frank’s Casing had fabricated 
in Louisiana for ARCO Oil and Gas Co. and its 
successor, Vastar Resources, Inc., collapsed and sank 
in the Gulf of Mexico. In May 1996, ARCO filed 
suit in Texas 
against two defendants, and after they in turn sued Frank’s Casing as a 
third-party defendant, ARCO and Vastar (who had joined 
the suit as plaintiff, collectively “ARCO”) named Frank’s Casing as a defendant 
in January 1997. Alleging that Frank’s Casing had failed to weld the platform 
components properly, ARCO sued for breach of contract, negligence, strict 
products liability, and contractual indemnity, seeking damages for lost profits 
and production and for costs of investigation, salvage, and repair, as well as 
exemplary damages and attorney fees.
            
In addition to a $1 million surplus lines comprehensive general liability 
insurance policy, Frank’s Casing had a $10 million umbrella policy provided by 
petitioners, Certain Companies Subscribing Severally But Not Jointly To Policy 
No. 548/TA4011F01 and Excess Underwriters at Lloyd’s, London (“the Excess 
Underwriters”). Frank’s Casing notified both insurers of ARCO’s suit. The primary insurer assumed the defense of the 
lawsuit, as was its right and duty under its policy, and hired counsel to 
represent Frank’s Casing.
 
            
In March 1997, counsel for the Excess Underwriters wrote Frank’s Casing a 
reservation-of-rights letter, stating in part:
Underwriters have commenced an investigation into the claims 
being made against Frank’s in the [ARCO] Litigation. We are writing to advise 
you of our representation of Underwriters, to advise that we will be evaluating 
the coverage provided by the Umbrella Policy, to request your assistance and 
cooperation in our investigation into the claims being made against Frank’s and 
the facts relevant to the Litigation, to advise that Underwriters have not yet 
come to any conclusions as to coverage, to invite Frank’s to provide 
Underwriters any information that you believe might assist Underwriters in their 
evaluation of the coverage questions, to solicit your input into our evaluation, 
and to advise Frank’s as to Underwriters’ preliminary reservation of certain 
rights under the Umbrella Policy.
 
 
Specifically, 
the letter explained that coverage of ARCO’s claims 
“may be limited or negated” under the umbrella policy because:
•           
claims alleging breach of contract and warranties “may not constitute an 
‘occurrence’ as that term is defined by the policy” – “an accident or a 
happening. . . which unexpectedly and unintentionally results in personal injury 
or property damage or advertising liability” ;
 
•           
the policy excluded property damage claims for the failure of Frank’s Casing’s 
product or work due to deficiencies in its designs, plans, or written 
instructions;
 
•           
the policy also excluded the costs of removal, recovery, repair, or replacement 
of product or work that failed to perform its function, and the costs of 
raising, removal, or destruction of any of wreckage or debris or obstruction, 
however caused;
 
•           
the policy expressly excluded coverage for punitive damages and would not cover 
any damages occurring after September 30, 1995, the end of the policy period; 
and
 
•           
notice of the claim may not have been timely.
 
The letter 
also stated that the scope of the umbrella policy’s coverage was to follow the 
form of the primary policy (other than the monetary limits, of course), which 
counsel had not had an opportunity to review, and that the primary policy might 
therefore further restrict coverage of ARCO’s claims. 
In January 1998, the Excess Underwriters sent Frank’s Casing a second 
reservation-of-rights letter giving an additional reason for lack of coverage: 
that ARCO’s claims for lost profits and loss of use of 
the platform were not “property damage” covered by the policy. The record does 
not reflect whether Frank’s Casing responded to the letters but does indicate 
that Frank’s Casing took the position that all claims were covered.
            
Nearing the February 16, 1998 trial setting, the parties discussed 
settlement. ARCO’s claims totaled $16 million (Frank’s 
Casing stipulated that property damage was $5,630,360.28), far more than the 
policy limits of Frank’s Casing’s insurance, but after an unsuccessful 
mediation, ARCO’s counsel offered to settle for $9.9 
million. Although Frank’s Casing had no express right under its primary policy 
to control settlement,[5] and may or may not have had one under the 
umbrella policy,[6] its corporate counsel unilaterally 
rejected the offer as too high, even though it was within policy limits, and did 
not even forward it to the Excess Underwriters. On January 30, counsel for the 
Excess Underwriters contacted ARCO directly, without Frank’s Casing’s knowledge, 
and attempted to settle only the claims they believed were covered, but no 
agreement was reached. When Frank’s Casing’s counsel learned of this, he 
objected to any settlement negotiations being conducted without his involvement. 
ARCO then offered to settle all of its claims against all of the defendants for 
$8.8 million. In a February 2 letter to corporate counsel for Frank’s Casing, 
counsel for the Excess Underwriters estimated that, after contributions offered 
by other defendants, Frank’s Casing would be required to contribute about $7.55 
million. Assuming that $750,000 of primary coverage remained, the letter made 
two proposals: the Excess Underwriters would pay two-thirds of the amount 
required to meet ARCO’s demand and waive all coverage 
issues if Frank’s Casing would pay one-third; alternatively, they would 
contribute $5 million to any reasonable settlement Frank’s Casing reached with 
ARCO and arbitrate coverage issues later. Frank’s Casing refused both 
proposals.
            
Under their policy, the Excess Underwriters had no duty to provide 
Frank’s Casing a defense but did have the right to associate in the defense with 
Frank’s Casing’s cooperation when it appeared likely they would be involved,[7] and on February 2, they retained separate 
trial counsel. Trial commenced February 17, and it immediately became clear for 
the first time that Frank’s Casing was ARCO’s target 
defendant. The next day, Frank’s Casing’s corporate counsel requested ARCO’s trial counsel to make a settlement offer within the 
umbrella policy’s limits, suggesting $7 million. ARCO promptly responded with a 
$7.5 million offer, which Frank’s Casing’s counsel immediately passed along to 
the Excess Underwriters in a letter hand-delivered and faxed to their counsel, 
insisting that since trial was not going well, “Frank’s does now look to 
Underwriters to settle this claim.” The letter added that the Excess 
Underwriters’ coverage reservations had “little credence” and that it was 
“probable” Frank’s Casing would suffer a jury verdict in excess of policy 
limits. ARCO’s last offer, the letter continued, was 
“one that an insurer, acting as a reasonably prudent insured, would accept.” 
Counsel concluded:
 
            
Should Underwriters in this instance refuse to move forward and resolve 
this dispute based upon [ARCO’s] current demand, 
[Frank’s Casing] specifically reserves its rights pursuant to the Stowers doctrine[[8]] to proceed against the Underwriters for 
any liability Frank’s may incur over and above the limits of its 
insurance.
 
 
            
On February 20, counsel for the Excess Underwriters responded by faxed 
letter that ARCO’s offer should be accepted but stated 
that they continued to believe “a substantial portion” of the claims were not 
covered and that it would be “unreasonable for Umbrella Underwriters to assume 
total responsibility for [ARCO’s] current demand.” The 
Excess Underwriters again proposed to resolve both ARCO’s claims and the coverage issues by paying two-thirds 
of ARCO’s settlement demand with Frank’s Casing paying 
one-third (after contribution of the remainder of the primary policy’s limits, 
which turned out to be about $500,000). Alternatively, the Excess Underwriters 
proposed to pay ARCO’s demand, less the contribution 
from the primary insurer, with Frank’s Casing’s agreement to resolve coverage 
issues later. When counsel for Frank’s Casing faxed a reply again refusing to 
contribute to the settlement and reiterating its demand that the Excess 
Underwriters accept ARCO’s offer, the Excess 
Underwriters acceded. ARCO had indicated that its offer would remain open only 
until the trial court’s ruling on a particular issue, which was expected 
imminently. By letter faxed to Frank’s Casing’s counsel on the morning of 
February 23, counsel for the Excess Underwriters stated that they were acting 
“to ensure that the favorable settlement will not be lost to both Frank’s and 
Umbrella Underwriters.” But, he added, the Excess Underwriters would “continue 
to reserve all coverage issues” and would “hold Frank’s responsible for and . . 
. seek reimbursement of all sums paid in settlement of claims for which no 
coverage exists”.
            
A few hours later, counsel for the Excess Underwriters’ faxed ARCO’s trial counsel a letter agreeing to pay $7.5 million 
in settlement. Frank’s Casing contends that it had no opportunity to respond to 
the Excess Underwriters’ reimbursement claim before the case settled. But when 
the settlement was announced to the court the next day, counsel for Frank’s 
Casing and the Excess Underwriters both referred to the latter’s reimbursement 
claim:
 
            
[Counsel for Frank’s Casing]: Underwriters have attempted to reserve all 
rights against Frank’s as to coverage under the umbrella policy. It is Frank’s 
position that no proper preservation of reservations has been made and Frank’s 
denies that the Underwriters may preserve coverages. 
More specifically, Underwriters’ offer to resolve the issue with [ARCO], which 
[was] made pursuant to Frank’s demand by a Stowers letter dated February 19, 1998 and February 
20th, 1998, forwarded by Michael Andrepont to Jay 
James Cooper, counsel for Underwriters.
 
            
Underwriters have accepted this offer in order to avoid the possibility 
of having to pay out funds in excess of policy limits. As a result, it is 
Frank’s position that Underwriters have either waived their right to reserve 
cover issues or alternatively [are estopped] from 
asserting any coverage issues since Underwriters have agreed to the 
settlement.
 
* * *
 
            
[Counsel for the Excess Underwriters]: This settlement is being funded by 
Frank’s Umbrella Underwriters subject to a full reservation of all rights 
against Frank’s under the umbrella policy No. 548TA4011FO1. And these 
Underwriters will hold Frank’s responsible for and will seek reimbursement of 
all sums paid the settlement of claims for which no coverage exists under the 
umbrella policy.
 
 
The parties 
later signed and filed a settlement agreement that made no reference to the 
Excess Underwriters’ reimbursement claim specifically but preserved “any claims 
that exist presently or may arise in the future between Defendant Frank’s and 
Frank’s Insurers arising from the claims asserted by Plaintiffs.”
            
Also on February 23, the Excess Underwriters filed this action against 
Frank’s Casing to resolve the coverage dispute and to obtain reimbursement for 
the settlement of any non-covered claims. They asserted seven provisions of the 
umbrella policy that limited or denied coverage of ARCO’s claims. The policy neither provided for nor 
prohibited a right of reimbursement; it was entirely silent on the subject. The 
Excess Underwriters asserted that the right was implied in law and in fact. In 
its answer, Frank’s Casing asserted in part that the Excess Underwriters had not 
stated a claim in contract or tort and had acted with unclean hands. Frank’s 
Casing also counterclaimed for negligence, bad faith, violations of the Texas 
Insurance Code, breach of contract, business disparagement, and a declaratory 
judgment that all of ARCO’s claims were covered by the 
umbrella policy.
            
The case was presented to the trial court in seven motions for partial 
summary judgment, five by the Excess Underwriters and two by Frank’s Casing, 
addressing separately the reimbursement issue, the various coverage issues, and 
damages. In September 1999, the trial court issued a series of orders granting 
the Excess Underwriters reimbursement for any non-covered claims and denying 
most of Frank’s Casing’s counterclaims. Then in March and April 2000, the trial 
court granted the Excess Underwriters’ motions on the coverage issues and denied 
Frank’s Casing’s remaining motion. Finally, on December 14, 2000, more than two 
years and nine months after the case was filed, the trial court granted the 
Excess Underwriters’ motion on damages, ordering that they were entitled to 
reimbursement of $7,013,612. But a week later, this Court issued its decision in 
Texas Association of Counties County Government Risk Management Pool v. 
Matagorda County, holding that an insurer that pays a claim later determined 
not to be covered by the policy is entitled to reimbursement “only if it obtains 
the insured’s clear and unequivocal consent to the settlement and the insurer’s 
right to seek reimbursement.”[9] The trial court directed Frank’s Casing 
to move for reconsideration on the issue of the right to reimbursement, and 
Frank’s Casing complied. After further hearing, the trial court granted the 
motion, withdrew its orders on that issue, granted summary judgment for Frank’s 
Casing on that issue, and signed a judgment that the Excess Underwriters take 
nothing. The trial court did not withdraw its orders resolving the coverage 
issue in favor of the Excess Underwriters.
            
Only the Excess Underwriters appealed. The court of appeals affirmed, 
although it noted:
 
            
We recognize this case carries Matagorda County to a logical conclusion that is 
somewhat disquieting — Frank’s was able to resolve the parties’ coverage dispute 
in its own favor simply by sending a Stowers 
demand to the Underwriters. Thereafter, the Underwriters had to pay if Arco’s 
claims were within the policy, but also had to pay if they [were] 
not within the policy because there was no right to reimbursement. But this 
is a matter that the Underwriters must take up with the superior court.[10]
 
 
            
The Court granted the Excess Underwriters petition for review[11] and issued an opinion reversing and 
remanding the case to the trial court for rendition of judgment in their 
favor.[12] Though two Justices did not join fully in the 
Court’s opinion,[13] none dissented from the judgment.[14] When respondent’s motion for rehearing 
was filed, only four of the Justices present at oral argument 
remained on the Court. To fully consider respondent’s motion, petitioner’s 
response, and a number of amicus briefs,[15] the Court granted the motion and ordered 
the case reargued.[16]
II
            
Frank’s Casing has not challenged, either in the court of appeals or in 
this Court, the trial court’s rulings on the coverage issues. Therefore, I 
assume that none of ARCO’s claims were covered by the 
umbrella policy. The only issue, then, is whether the Excess Underwriters are 
entitled to be reimbursed for the amount they paid in settlement.
            
The parties agree that the coverage issues were governed by Louisiana law, but they disagree whether the reimbursement 
issue is governed by Louisiana law or 
Texas law, and 
whether the two are different. Frank’s Casing contends that the Excess 
Underwriters never requested the application of Louisiana law in the trial court and that in any event, on 
the issue before us it is no different than Texas law. The Excess Underwriters alluded to 
Louisiana law 
twice in the trial court. A six-sentence footnote in their motion for summary 
judgment began, “[t]o the extent Louisiana law 
might apply to this case”, and then cited two Louisiana statutes[17] and two cases[18] generally allowing recovery for unjust 
enrichment. None of the authorities cited specifically addressed the issue in 
this case. In response to Frank’s Casing’s motion for reconsideration, after 
this Court’s decision in Matagorda County issued, the Excess Underwriters 
again briefly cited general Louisiana authority “[t]o the extent this Court 
finds Louisiana law controlling”. Neither instance amounted to an actual 
assertion that the reimbursement issue is controlled by Louisiana law. If 
Louisiana law 
were controlling, it is not clear from the authorities cited how it would 
resolve the issue before us. Without proof that Louisiana and Texas law are different, they should be 
presumed to be the same,[19] and which of the two states’ law 
controls need not be resolved.
            
Accordingly, I turn to the question whether Texas law affords an 
insurer the right to reimbursement from its insured for settling a non-covered 
liability claim.
III
            
When the parties to a contract disagree over what performance is required 
and that disagreement cannot be resolved before performance is due, the party 
who must perform is put to the choice of doing more than he thinks is called for 
or facing the other party’s claim of breach. The potential adverse consequences 
of the latter course may be severe enough that the party is all but forced to 
render the performance demanded and forego resolution of the dispute. The other 
party thus obtains more than he bargained for.
            
According to the Restatement (Third) of Restitution and Unjust 
Enrichment:
 
            
The commonsense solution to this dilemma — allowing performance with 
reservation of rights — promotes justice and efficiency. Because it offers 
recourse to a party who might otherwise be effectively compelled to render an 
extracontractual performance, it serves both to 
reinforce the parties’ agreement and to prevent the unjust enrichment that would 
otherwise result. Equally important, the mechanism of contingent or provisional 
performance (that is, performance subject to an eventual claim in restitution) 
will serve in many cases to reduce the overall cost of resolving the parties’ 
dispute. Disputes over contractual requirements commonly arise in the midst of 
the undertaking, rather than at its outset or conclusion. The cost of 
interruption is then at its highest; the risk of consequential harms (which must 
ultimately be borne by one party or the other) leverages the stakes beyond the 
amount initially in dispute. If the party on whom a questionable demand is made 
can protect its position only by refusing performance, the costs of resolution 
are magnified accordingly. Performance with reservation of rights can reduce 
these costs by deferring dispute resolution to a point at which the risk of 
consequential harm is lower.[20]
 
Provisional 
performance is the rule for transactions governed by the Uniform Commercial 
Code, which provides that “[a] party that with explicit reservation of rights 
performs or promises performance or assents to performance in a manner demanded 
or offered by the other party does not thereby prejudice the rights reserved.”[21] The UCC imposes no requirement that the 
other party consent to the reservation for it to be effective.
            
The point of reserving rights is, of course, is to see them vindicated, 
which cannot be accomplished without a remedy.[22] The remedy, according to the 
Restatement (Third) of Restitution and Unjust Enrichment, is restitution. 
The UCC provision, the Restatement explains, “presume[s] . . . that the ‘rights reserved’ by a performing 
party — ‘where one party is claiming as of right something which the other 
believes to be unwarranted’ — take the form of a claim in restitution for the 
value of any benefit conferred to which the recipient was not entitled.”[23] Texas law recognizes restitution as a remedy 
for unjust enrichment “[w]hen a person has obtained a benefit by taking undue 
advantage of another”.[24] The Restatement sets out the 
following rule, originally suggested by Professor Mark Gergen:[25]
 
§ 35. Performance of Disputed Obligation
 
            
(1)        If one party to a contract 
demands from the other a performance that is not in fact due by the terms of 
their agreement, the party on whom the demand is made may render such 
performance under protest or with reservation of rights, preserving a claim in 
restitution to recover the value of the benefit conferred in excess of the 
recipient’s contractual entitlement.
 
            
(2)        The claim described in 
subsection (1) is available only to a party acting in good faith and in the 
reasonable protection of the claimant’s own interests. It is not available where 
there has been an accord and satisfaction between the parties, or where a 
performance with reservation of rights is inadequate to discharge the claimant’s 
obligation to the recipient.[26]
 
 
The rule 
restricts restitution to claimants who act in good faith and in the reasonable 
protection of their own interests. The provisional performance must also go far 
enough to discharge a claimant’s obligation. In such circumstances, restitution 
is not precluded by the voluntary-payment rule because, as comment b to section 
35 explains, the claimant acts under a kind of coercion — the pressure to take 
action to avoid consequential harms before uncertainty as to contractual 
obligations can be resolved.[27]
            
Section 35 restates the principle of restitution inherent in the UCC 
provision and applicable to contracts generally. But insurance policies are not 
governed by the UCC, and as comment c to section 35 recognizes, “disputes 
between insurers and policyholders over the insurer’s duty to pay a claim, or to 
settle or defend a claim brought against the policyholder, present special 
difficulties for the law of restitution, because the insurer’s duty to indemnify 
and defend is subject to extensive regulation under local insurance law.”[28] Regulation is necessary because an 
insured is typically at a distinct disadvantage in dealing with an insurer, 
having little or nothing to say about the policy language, little or no 
experience in evaluating coverage issues, and neither the wherewithal nor the 
inclination to litigate disputes. The prospect that a third-party liability 
claim may not be covered by insurance poses a significant threat to most insureds. As the Restatement observes, “[p]ublic policy strongly favors the prompt discharge of an 
insurer’s obligations to its policyholder.”[29]
            
Nevertheless, Texas law permits a liability insurer to 
defend or settle a claim against its insured while reserving its rights to 
contest coverage,[30] as long as it acts timely and in good 
faith.[31] An insured may reject the reservation, 
demand an unconditional defense, and sue for contractual and extracontractual damages.[32] But if the insured does not reject the 
reservation, the insurer must be given a meaningful opportunity to resolve the 
coverage dispute if the reservation is to be anything but an empty formality. 
Without that opportunity, the Restatement explains:
 
the risk of enhanced liability in coverage disputes may compel 
a performance by the insurer that is outside the scope of the insurance 
contract. If the insurer, by denying coverage, risks a potential liability 
greater than the amount initially in controversy — and if the insurer is obliged 
to take action before the coverage issue can be adjudicated — the effect of the 
applicable legal rules may be to subject the insurer to an extracontractual liability. Such a result distorts the 
parties’ allocation of risks and creates the sort of unjust enrichment with 
which the present Section is concerned.[33]
 
 
            
The present case is a prime example of such distortion of risk and unjust 
enrichment when an insurer is denied restitution from its insured for settling 
non-covered claims. The Excess Underwriters’ Stowers obligation was to accept a reasonable 
settlement offer within policy limits or stand to the full recovery against 
Frank’s Casing, even beyond policy limits. Once ARCO made such an offer, Frank’s 
Casing had almost no incentive to confront the coverage issues. If ARCO’s claims were covered by the Excess Underwriters’ 
policy, Frank’s Casing had no exposure, and if the claims were not covered, so 
what? If the Excess Underwriters settled and won the coverage dispute, Frank’s 
Casing had nothing to lose without an obligation to reimburse the settlement of 
the non-covered claims. And if the Excess Underwriters did not settle and lost 
the coverage dispute, Frank’s Casing would have no obligation. Only if the 
Excess Underwriters refused to settle and later won the coverage dispute would 
Frank’s Casing risk any liability. But while Frank’s Casing’s risk of refusing 
to contribute to the settlement was slight, the Excess Underwriters’ risk of 
refusing to settle was enormous. Even if they won the coverage dispute, they 
could not recover without a right of reimbursement, and if they lost the 
coverage dispute, their Stowers liability would 
extend to ARCO’s full recovery, perhaps $16 million. 
Having estimated their ultimate exposure to be $5 million, as reflected in their 
settlement offer to Frank’s Casing, the Excess Underwriters barely hesitated in 
paying $2 million more to settle $16 million in claims, especially after trial 
had begun and Frank’s Casing itself viewed ARCO’s case 
claims as strong.
            
If the Excess Underwriters’ assessment of the coverage issues had been 
correct, they would have paid $2 million more than they owed. As it turned out, 
the Excess Underwriters were finally determined to have no obligation at all. 
None of ARCO’s claims were covered. Stowers liability combined with no right of 
reimbursement effectively forced the Excess Underwriters to extend Frank’s 
Casing $7 million in coverage for which it had not contracted and had paid 
nothing. Such disincentive for insurers to resolve coverage issues carries a 
cost that must be paid in higher premiums.
            
The purpose of the law of restitution is to prevent such unjust 
enrichment without permitting abuse. In Matagorda County, the Court noted that an 
insurer’s right of reimbursement could operate unfairly against an insured. 
Though the Court did not elaborate, such a situation can occur when the 
plaintiff’s claims exceed the defendant’s assets, but not its policy limits, 
coverage is uncertain, and the insurer can settle over the defendant’s 
objection.[34] But Matagorda County incorrectly 
asserted that a right of reimbursement might result in a defendant having to pay 
more than it is worth.[35] It is impossible for an insurer to exact 
more from an insured than he is worth; you can’t squeeze blood from a turnip. 
And an insurer has no more incentive or ability to sue for reimbursement that 
cannot 
class=Section3> 
be collected 
than a plaintiff has to demand a settlement that cannot be paid. Indeed, it 
almost always has less incentive. Not only will the insurer want to leverage the 
coverage dispute to extract a lower settlement demand from the plaintiff, but an 
insurer who pursues its insured into bankruptcy does so at a business cost paid 
in bad customer relations and lower premiums.
            
In any event, Frank’s Casing does not argue that an obligation to 
reimburse the Excess Underwriters would have put it in the predicament 
hypothesized in Matagorda County. Frank’s Casing is a 
substantial business, and there is nothing to indicate that it lacked the means 
to meet its liability to ARCO. When both the defendant’s assets and the 
plaintiff’s demand exceed the insurer’s policy limits, granting the defendant 
the unilateral power to accept or reject a settlement offer may unfairly 
prejudice the insurer.[36]
            
The possibility of prejudice to an insured, not actually 
present in either this case or in Matagorda County, is avoided under 
section 35, which would not allow reimbursement because the insurer’s settlement 
of the claim under a reservation of rights would result in a higher payment by 
the insured and therefore be “inadequate to discharge [the insurer’s] obligation 
to the [insured]”. The remedy for unjust enrichment does not come at a price of 
unfairness to the other party. Further, if the restrictions on restitution 
contained in section 35 were inadequate to prevent an unjust application of the 
rule, equity could intervene because restitution is an equitable remedy.[37] If an insured were unfairly prejudiced 
by affording an insurer a right of reimbursement, the answer is to limit the 
right in that situation to prevent the prejudice, not to deny it altogether in 
the many other cases in which it is necessary to prevent unjust enrichment.
            
The Court rejects section 35, not because it is in any way unfair to 
insureds, but because it “undermine[s] . . . the 
predictability that our decision in Matagorda County provided”.[38] Of course, it does. Never is 
extremely predictable. But section 35 would certainly create no serious 
unpredictability in this case or any one like it. It is not very hard to see 
that Frank’s Casing should not be given the benefit of coverage it did not 
buy.
            
Frank’s Casing and amici curiae have raised 
several other arguments against an insured’s right to be reimbursed by its 
insured for settling non-covered claims.
            
1.         Such a right disincentivizes insurers to obtain a resolution of coverage 
issues before a liability claim must be settled. We have encouraged prompt 
resolution of coverage issues through declaratory judgment actions.[39] The argument that an insurer entitled to 
reimbursement might delay such resolution is easily answered; an insurer who 
intentionally delays resolution of coverage issues to prejudice the insured may, 
in a particular case, forfeit the right of reimbursement by failing to act in 
the good faith required by section 35.
            
Denying reimbursement altogether raises a different set of problems. 
Early resolution of coverage issues is often impossible or imprudent.[40] In many cases, there is simply not time. 
Here, for example, while Frank’s Casing faults the Excess Underwriters for doing 
nothing to resolve coverage issues in the eleven months that the liability case 
was pending against it, the fact that the coverage case took nearly three years 
and seven motions for summary judgment strongly suggests that it could not have 
been completed before the trial of ARCO’s claims. In 
other cases, litigating coverage while the liability claim is pending is 
prejudicial to the insured. The insured may be forced to take positions in 
support of coverage that undermine the defense of the liability claim. Pitting 
the insurer and insured against one another may create intolerable conflict at a 
time when their interests in defending against liability should be aligned. It 
may simply be distracting and difficult for the insured to fight the liability 
claimant on one front and his insurer on another. These problems may now be 
unavoidable, since the Court’s refusal to allow an insurer to recover payment of 
a non-covered claim means that unless an insured agrees to defer coverage 
issues, they must be determined before the liability claim is resolved or be 
forever lost. It may even be necessary to delay resolution of the liability 
claim. The Court certainly does not suggest that an insurer should be denied a 
fair opportunity to litigate coverage issues.
            
2.         If there is to be 
such a right, it should be expressed in the policy. It is well settled that 
the law may imply contractual terms to prevent unjust enrichment. In Ferrous 
Products Co. v. Gulf States Trading Co., we said, quoting hornbook law:
 
A quasi contractual obligation is one that is created by the 
law for reasons of justice, without any expression of assent and sometimes even 
against a clear expression of dissent.
 
* * *
 
Contracts implied in law, or more properly quasi or 
constructive contracts, are a class of obligations which are imposed or created 
by law without regard to the assent of the party bound, on the ground that they 
are dictated by reason and justice, and which are allowed to be enforced by an 
action ex contractu. . . . Such 
contracts rest on the equitable principle that a person shall not be allowed to 
enrich himself unjustly at the expense of another, and on the principle that 
whatsoever it is certain that a man ought to do, that the law supposes him to 
have promised to do.[41]
 
 
This settled 
law is a part of every contract and governs the transaction.[42] The argument here is that the general 
law of restitution should not apply. But restitution is necessary if an 
insurer’s reservation of rights, long allowed by Texas law, is to have any viability in cases 
in which coverage issues cannot be resolved before the liability claim. To deny 
restitution in such cases, given an insurer’s Stowers duty to accept a reasonable settlement of a 
liability claim within policy limits, is effectively to create coverage where 
none exists. That is what happened in this case.
            
3.         An express 
agreement — the policy — precludes an agreement implied in law. This both 
misstates the law and misapplies it to this case. It is true, as we said in 
Fortune Production Co. v. Conoco, Inc., that
 
[g]enerally speaking, when a valid, 
express contract covers the subject matter of the parties’ dispute, there can be 
no recovery under a quasi-contract theory. . . . That is because parties should 
be bound by their express agreements. When a valid agreement already addresses 
the matter, recovery under an equitable theory is generally inconsistent with 
the express agreement.[43]
 
 
But we also 
specifically noted that there were certain exceptions which would allow recovery 
of “overpayments under a contract . . . under a theory of restitution or unjust 
enrichment.”[44] Moreover, the Excess Underwriters’ 
policy does not cover the subject of restitution. It required that Frank’s 
Casing make a claim within a year after its liability became fixed[45] and then allowed the Excess Underwriters 
thirty days to decide whether to pay it. But this provision neither required nor 
entitled the Excess Underwriters to defer a decision on a claim until after 
Frank’s Casing had settled it and thus force a Stowers violation. The policy merely provided an 
outside time frame for making and paying claims. On the subject of reimbursement 
in the circumstances before us the policy was entirely silent, and that silence 
does not preclude restitution.
            
4.         The risk of any 
uncertainty about coverage should be borne entirely by the insurer because of 
its control of the liability litigation and its superior knowledge and 
experience with coverage issues. There is no question that most insurers are 
better able to assess coverage issues than most insureds, since insurers are likely to have encountered the 
issues many times. But as this case illustrates, an insurer must be virtually 
certain that coverage does not exist before it can justify the risk of refusing 
to settle a claim within policy limits. Few cases are so clear. As the 
Restatement recognizes, restitution is an equitable accommodation of the 
insurer’s and insured’s interests in reserving and later resolving coverage 
issues. Also, while it may be possible for an insurer to exercise its right to 
control the defense and settlement of a liability claim in a way that unfairly 
prejudices an insured sued for restitution, the prejudice can be addressed in 
any case in which it occurs without denying restitution in all cases. Frank’s 
Casing makes no claim of such prejudice in this case.
            
5.         Insurers will use 
meritless coverage issues and the threat of a suit for reimbursement to force 
insureds to contribute to settling claims when they 
should not have to. This is not what happened in the present case. Instead, 
Frank’s Casing repeatedly refused to contribute anything to the settlement of 
ARCO’s claims, either settling the coverage issues at 
the same time or reserving resolution for later, when the umbrella policy 
provided no coverage at all. The law does not punish insureds for such obduracy as it would insurers, as for 
example with Stowers liability. But an insured 
should not be rewarded for forcing coverage when none exists. An insurer who 
raises bogus coverage issues to extract a settlement contribution from an 
insured is subject to other sanctions as for any unfair practice.[46]
            
6.         Defense counsel 
cannot advise an insured that a settlement offer is reasonable if in so doing he 
subjects the insured to a reimbursement obligation. The premise is 
incorrect. Counsel’s advice regarding the reasonableness of an offer does not 
trigger the insurer’s claim for restitution. That claim depends entirely on the 
effectiveness of the reservation of rights, the resolution of coverage issues, 
the reasonableness in fact of the acceptance of the settlement offer, and the 
insurer’s good faith and absence of inequitable conduct. Of course, if counsel’s 
advice is communicated beyond persons protected by the attorney-client 
privilege, it may be evidence of the reasonableness of the offer when the issue 
arises, but if kept confidential the advice would be privileged from disclosure. 
A right of restitution does not pose a conflict for defense counsel in advising 
the insured. In this case, there is no hint of such a conflict. We have no 
indication what Frank’s Casing’s defense counsel thought of ARCO’s settlement offer, and corporate counsel did not 
hesitate in pronouncing the offer reasonable and twice insisting that the Excess 
Underwriters accept it.
            
7.         If an insurer’s 
settlement of a non-covered claim can be recovered from the insured, the insurer 
will settle early, even if unfavorably, to minimize defense expenses and avoid 
Stowers liability. It is difficult to 
imagine why an insurer would accept a settlement offer that is unreasonable and 
to which its insured objects, and then try to seek reimbursement from the 
insured. If for some reason it occurred, it would exhibit the the lack of good faith that section 35 requires.
            
These arguments do not support making an exception to the general law of 
restitution for the defense and settlement of liability insurance claims. The 
Court cites only one other court of last resort that has considered the issue: 
Blue Ridge Insurance Co. v. Jacobsen. There, the Supreme Court of 
California allowed a right of reimbursement in circumstances similar to this 
case.[47] I agree with the reasoning of that case, 
as does the Restatement.[48]
* * * * *
            
I would reverse the court of appeals’ judgment and remand the case to the 
trial court for rendition of judgment in favor of the Excess Underwriters. 
Accordingly, I respectfully dissent.
 
                                                                        
___________________          

                                                                        
Nathan L. Hecht
                                                                        
Justice
 
Opinion delivered: February 1, 
2008








[1] 
Blue Ridge Ins. Co. v. Jacobsen, 22 P.3d 313, 318-319 (Cal. 2001); 
Colony Ins. Co. v. G & E Tires & Serv., Inc., 777 So.2d 1034, 
1038-1039 (Fla. Dist. Ct. App. 2000).

[2] 
Restatement (Third) of Restitution and 
Unjust Enrichment § 35 & reporter’s note to cmt. c, illus. 10 (Tentative Draft No. 3, 2004) (“it is the 
dissenting opinion in Texas Ass’n of Counties 
[County Gov’t Risk Mgmt. Pool v. Matagorda 
County, 52 S.W.3d 128, 136 (Tex. 2000) (Owen, J., joined by Hecht, J., 
dissenting)] that reflects the position of this Restatement”). 

[3] 
Mark P. Gergen, Restitution as a Bridge over 
Troubled Contractual Waters, 71 Fordham L. Rev. 709, 725-728 
(2002).

[4] 
Restatement (Third) of Restitution and 
Unjust Enrichment § 35 & reporter’s note to cmt. a (Tentative Draft No. 3, 2004). Tentative Draft No. 3 
was approved by the membership of the American Law Institute during its annual 
meeting on May 18, 2004. American Law 
Institute, Proceedings at 81st Annual Meeting 259-260 (2004).

[5] 
The policy provided that the insurer “shall have the right and duty to defend 
any suit against the Assured . . . and may make such investigation and 
settlement of any claim or suit as it deems expedient”.

[6] 
The policy provided: “The Assured shall make a definite claim for any loss for 
which the Underwriters may be liable under this policy within twelve (12) months 
after the Assured shall have paid an amount of ultimate net loss in excess of 
the amount borne by the Assured or after the Assured’s 
liability shall have been fixed and rendered certain either by final judgment 
against the Assured after actual trial or by written agreement of the 
Assured, the claimant, and Underwriters.” (Emphasis added.) The Excess 
Underwriters argue that the last phrase gives Frank’s Casing the right to 
consent to any settlement, but Frank’s Casing argues that this stretches the 
phrase’s meaning.

[7] 
The policy provided:
 
The Underwriters shall not be called upon to assume 
charge of the settlement or defense of any claim made or suit brought or 
proceeding instituted against the Assured but Underwriters shall have the right 
and shall be given the opportunity to associate with the Assured or the Assured’s underlying insurers or both in the defense and 
control of any claim, suit or proceeding relative to an occurrence where the 
claim or suit involves, or appears reasonably likely to involve Underwriters, in 
which event the Assured and Underwriters shall co-operate in all things in the 
defense of such claim, suit or proceeding.

[8] 
See American Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 843 
n.2 (Tex. 1994) (“The duty of an insurer to exercise ordinary care in the 
settlement of claims to protect its insureds against 
judgments in excess of policy limits is generically referred to in Texas as the 
Stowers duty.”); Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544 (Tex. Comm’n App. 1929, holding approved).

[9] 
52 S.W.3d 128, 135 (Tex. 2000) (“[W]e hold that, when coverage is disputed and 
the insurer is presented with a reasonable settlement demand within policy 
limits, the insurer may fund the settlement and seek reimbursement only if it 
obtains the insured’s clear and unequivocal consent to the settlement and the 
insurer’s right to seek reimbursement.”).

[10] 93 S.W.3d 178, 180 (Tex. App.–Houston [14th 
Dist.] 2002).

[11] 46 Tex. Sup. Ct. J. 546 (Apr. 3, 2003).

[12] 48 Tex. Sup. Ct. J. 735 (May 27, 2005).

[13] Id. at 744 (O’Neill, J., concurring); 
id. at 746 (Wainwright, J., concurring).

[14] Justice Brister did not participate in 
the decision, having authored the opinion for the court of appeals while serving 
as Chief Justice of that court. Justice 
Johnson also did not participate, having recently been appointed to the 
Court.

[15] Amicus briefs in support of respondent’s 
motion for rehearing have been submitted by United Policyholders; Brad Fish, 
Inc.; Pilco, Inc.; Shell Oil Co.; Motiva Enterprises 
LLC; Burlington Resources Inc.; Temple-Inland Inc.; Texas Civil Justice League; 
Texas Ass’n of Defense Counsel, Inc.; and Valero 
Energy Corp. Amicus briefs opposing the motion have been filed by Property 
Casualty Insurers Ass’n of America; American Insurance 
Ass’n; and Complex Insurance Claims Litigation Ass’n, on behalf of its members: AIG; Chubb & Son; 
Farmers Insurance Group; The Hartford Insurance Group; Liberty Mutual Group 
Inc.; St. Paul Fire and Marine Insurance Co.; Selective Insurance Co. of 
America; The Travelers Indemnity Co. and Travelers Indemnity and Surety Co.; and 
Zurich American Insurance Co.

[16] 49 Tex. Sup. Ct. J. 240 (Jan. 6, 2006).

[17] La. 
Civ. Code Ann. arts. 2055, 2298.

[18] Edmonston v. A-Second Mortgage Co. of Slidell, 289 So.2d 116 (La. 1974); E.F. Minyard v. 
Curtis Prods., Inc., 205 So.2d 422 (La. 1968).

[19] Coca-Cola Co. v. Harmar Bottling Co., 218 S.W.3d 671, 685 (Tex. 2006); Gevinson 
v. Manhattan Constr. Co. of Okla., 449 S.W.2d 458, 465 n. 2 (Tex. 1969); Milner v. Schaefer, 211 S.W.2d 600, 603 
(Tex. Civ. App.—San Antonio 1948, writ ref’d); Tempel v. Dodge, 33 S.W. 222, 222 (Tex. 1895).

[20] Restatement (Third) of Restitution and Unjust 
Enrichment § 35 cmt. a (Tentative Draft No. 3, 
2004).

[21] Tex. Bus. & Com. Code §§ 1.102 
(“Scope of Chapter” in Uniform Commercial Code); 1.308(a) (“Performance or 
Acceptance Under Reservation of Rights”).

[22] See Miers v. Brouse, 271 S.W.2d 419, 421 (Tex. 1954) (“The first 
maxim of equity is that it will not suffer a right to be without a remedy. As 
Lord Holt early said: ‘If the plaintiff has a right, he must of necessity have a 
means to vindicate and maintain it . . . . It is a vain thing to imagine a right 
without a remedy.’” (citation omitted)); Ashby v. White, 92 Eng. Rep. 
126, 136 (K. B. 1703) (Lord Holt, C.J., dissenting), reprinted in 1 Smith’s Leading Cases 464, 483 (9th 
ed. 1889). On writ of error from the King's Bench, the House of Lords reversed 
the judgment and ruled in favor of the plaintiff for the reasoning stated in 
Lord Chief Justice Holt's dissent. 1 Eng. Rep. 417 (H.L. 1703); see 90 
Eng. Rep. 1188 (H.L. 1703); John William 
Smith et al., A Selection of Leading Cases on Various Branches of the Law: With 
Notes 509 (9th ed., Charles H. Edson & Co. 
1888).

[23] Restatement (Third) of Restitution and Unjust 
Enrichment § 35 cmt. a (Tentative Draft No. 3, 
2004). 

[24] Heldenfels Bros., Inc. v. City of Corpus 
Christi, 832 S.W.2d 39, 41 (Tex. 1992) (“A party may recover under the 
unjust enrichment theory when one person has obtained a benefit from another by 
fraud, duress, or the taking of an undue advantage.”).

[25] See Gergen, supra note 3, 
at 728.

[26] Restatement (Third) of Restitution and Unjust 
Enrichment § 35 (Tentative Draft No. 3, 2004); id. cmt. a (“The rule of this Section is implicit in the 
negative statement of U.C.C. § 1-308(a) . . . .”). 

[27] Restatement (Third) of Restitution and Unjust 
Enrichment § 35 cmt. b (Tentative Draft No. 3, 
2004) (“When the cost of resistance includes a risk of further loss or 
liability, beyond the amount already in controversy, the party on whom the 
demand is made may have no practical alternative but to submit. Performance in 
such cases is not ‘voluntary,’ and restitution is uniformly available to rectify 
the overperformance that the claimant has effectively 
been compelled to render.”); see Dallas County Cmty. Coll. Dist. v. Bolton, 185 S.W.3d 868, 886 (Tex. 
2005); BMG Direct Mktg. v. Peake, 178 S.W.3d 
763, 776-778 (Tex. 2005).

[28] Id. cmt. 
c.

[29] Id.

[30] See American Physicians Ins. 
Exch., 876 S.W.2d at 861 (Hightower, J., dissenting).

[31] See American Eagle Ins. Co. v. 
Nettleton, 932 S.W.2d 169, 174 (Tex. App.—El Paso 1996, writ denied) (“[A]n 
insurer may undertake the insured’s defense and later deny coverage if it 
‘reserves its rights’ by advising the insured that it may interpose a policy 
defense following adjudication of the claimant’s suit against the insured. This 
is a proper course of action only when the insurer has a good faith belief that 
the complaint alleges conduct which may not be covered by the policy. In such a 
situation, the reservation of rights will not breach the duty to defend if 
timely notice of intent to reserve rights is sufficient to inform the insured of 
the insurer’s position.” (citations omitted)).

[32] Texas Ass'n of 
Counties County Gov’t Risk Mgmt. Pool v. Matagorda 
County, 52 S.W.3d 128, 141 (Tex. 2000) (Owen, J., joined by Hecht, J., 
dissenting) (“Under Texas law, if an insurance company tenders a defense with a 
reservation of rights, the insured may either accept that defense with the 
reservation of rights, or it may refuse the tendered defense and defend the suit 
itself. If the insured decides to defend itself, it must bear the cost of that 
defense if the claims against it are not covered by insurance.” (citation 
omitted)).

[33] Restatement (Third) of Restitution and Unjust 
Enrichment § 35 cmt. c (Tentative Draft No. 3, 
2004).

[34] Suppose the following: at trial, P has a 
50% probability of recovering 10 and a 50% probability of recovering 0; coverage 
is 50/50; policy limits are 10; and D has 2 in assets. 
                
    P expects, on average, to recover 3. Half the time P 
loses at trial and takes nothing. A fourth of the time he wins at trial and 
there is coverage, so he recovers 10 from I. But another fourth of the time he 
wins at trial but there is no coverage, so he is limited to D’s assets, 2. With 
one chance at 10, one at 2, and two at 0, he should expect 3.
                
    With no right of reimbursement, I expects at trial to 
pay only 2.5 on average, since there is only one chance in 4 that it will owe 
10, and D expects to pay only 0.5 on average, since there is only one chance in 
4 that it will owe 2. If there is a right of reimbursement, I can pay P 3 to 
settle and still lower its expected cost to 2 on average, since half the time it 
will recover nothing from D in the coverage suit and the other half it will 
recover D’s 2. But D’s expected cost then increases, on average, to 1, since it 
will lose the coverage fight half the time. In this situation, if I can insist 
on settling for 3, it benefits itself and harms D.

[35] 52 S.W.3d at 135 (stating that a right of 
reimbursement might force an insured to “choose between rejecting a settlement 
within policy limits or accepting a possible financial obligation to pay an 
amount that may be beyond its means, at a time when the insured is most 
vulnerable.”).

[36] Now suppose: at trial, P has a 50% 
probability of recovering 20 and a 50% probability of recovering 0; coverage is 
50/50; policy limits are 10; and D has 50 in assets. 
                
    At trial, P expects, on average, to recover 10. D 
expects, on average, to pay 7.5. I expects, on average, to pay 2.5. If D has the 
unilateral power to accept or reject settlements, even assuming I has a right of 
reimbursement, I’s average expected cost is increased 
to 5, and D’s falls to 5. But if D can use the threat of Stowers liability to force I to pay 10, and I has no 
right of reimbursement, I’s average expected cost is 
increased to 10, and D’s falls to 0. 

[37] BMG Direct Mktg. v. Peake, 178 S.W.3d 763, 771, 775(Tex. 2005) (noting, however, that “an adequate legal 
remedy may render equitable claims of unjust enrichment and equitable defenses 
of voluntary-payment unavailable” and citing Matagorda County, 52 S.W.3d 
128, 133-135 (Tex.2000)); Dallas County Cmty. Coll. Dist. v. Bolton, 185 S.W.3d 868, 886 (Tex. 
2005) (Brister, J., joined by Jefferson, C.J, and O’Neill, J., dissenting to 
opinion holding that allegedly illegal student activity fees were voluntarily 
paid as a matter of law). See Restatement (Third) of Restitution and Unjust 
Enrichment § 1, cmt b (“This equitable 
conception of the law of restitution is crystallized by Lord Mansfield’s famous 
statement in Moses v. Macferlan (1761): ‘In one 
word, the gist of this kind of action is, that the defendant, upon the 
circumstances of the case, is obliged by the ties of natural justice and equity 
to refund the money.’ Explaining restitution as the embodiment of natural 
justice and equity gives the subject an undoubted versatility, an adaptability 
to new situations, and — in the eyes of many observers — a particular moral 
attractiveness. Restitution in this view is the one aspect of our legal system 
that makes a direct appeal to standards of equitable and conscientious behavior 
as a source of obligations that society will enforce with a legal 
sanction.”).

[38] Ante at ___.

[39] See, e.g., Farmers 
Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997) 
(per curiam); State Farm Fire & Cas. Co. v. Gandy, 925 S.W.2d 696, 714 (Tex. 
1996).

[40] Griffin, 955 S.W.2d at 
84.

[41] 332 S.W.2d 310, 312 (Tex. 1960) (citations 
omitted).

[42] See, 
e.g., Wessely Energy Corp. v. Jennings, 736 S.W.2d 624, 626 (Tex. 1987) (“The laws 
existing at the time a contract is made becomes a part of the contract and 
governs the transaction. Langever v. 
Miller, 124 Tex. 80, 76 S.W.2d 1025, 1026-27 (1934).”).

[43] 52 S.W.3d 671, 684 (Tex. 2000) (citations 
omitted).

[44] Id. (citing Southwestern 
Elec. Power Co. v. Burlington N. R.R. Co., 966 S.W.2d 467, 469 (Tex. 1998) 
(“[I]n some circumstances, overpayments under a valid contract may give rise to 
a claim for restitution or unjust enrichment.”)).

[45] See supra note 6.

[46] See Tex. Ins. Code § 541.060 (prohibiting 
certain unfair settlement practices).

[47] 22 P.3d 313, 318-319 
(Cal. 
2001).

[48] Restatement (Third) of Restitution and Unjust 
Enrichment § 35, illus. 10 & reporter’s note (Tentative Draft No. 3, 
2004).